# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Statesboro Division

**FILED**

Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 5:15 pm, Mar 26, 2014

In the matter of:                    )
                                     )          Chapter 13 Case
WILLIAM C. WAITS,                    )
                                     )          Number <u>12-60405</u>
            *Debtor.*                )

## OPINION AND ORDER DISAPPROVING DEBTOR'S MODIFICATION TO CHAPTER 13 PLAN AFTER CONFIRMATION AND GRANTING TRUSTEE'S MOTION TO DISMISS WITH PREJUDICE FOR 180 DAYS

This is the third occasion that O. Byron Meredith, III, the chapter 13 trustee ("<u>Trustee</u>"), has brought the issue of the debtor's failure to make his chapter 13 plan payments before the Court. On the first two occasions, Trustee and William C. Waits ("<u>Debtor</u>") entered into consent orders requiring Debtor's strict compliance with terms relating to future payments. Trustee responded to Debtor's third alleged default by filing a Notice of Non-Compliance of Strict Compliance Order (dckt. 52), which is now under the Court's consideration.[1] Presumably in response to Trustee's notice, Debtor filed a proposed modification to his confirmed chapter 13 plan. (Dckt. 60). In turn, Trustee and The Claxton Bank ("<u>Claxton Bank</u>") filed objections to the proposed modification. (Dckts. 63, 65, 78.)

The Court held a hearing on all of these filings and concludes that Debtor is not entitled to modify his chapter 13 plan because the modification was not filed in good

---

[1] The Court takes Trustee's notice as a motion to dismiss.

AO 72A
(Rev. 8/82)

faith. As a result, Debtor's case will be dismissed for his repeated failure to make the payments that he promised under his confirmed plan (dckt. 33), the Consent Order on Trustee's Motion to Dismiss (dckt. 40), and the Amended Consent Order on Trustee's Motion to Dismiss (dckt. 50). In accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

A consolidated evidentiary record was made, and the following facts were either proven or are the proper subject of judicial notice.[2]

### A.   Procedural History

Debtor commenced this bankruptcy case by filing a chapter 13 petition on July 25, 2012. (Dckt. 1.) On November 7, 2012, the Court confirmed Debtor's plan. (Dckt. 33.)

Less than three weeks later, Trustee filed a motion to dismiss Debtor's case for failure to make his plan payments. (Dckt. 34.) On December 17, 2012, Debtor filed a request for hearing on Trustee's motion to dismiss. (Dckt. 35.) On January 15, 2013, the Court entered a consent order that resolved Trustee's motion to dismiss, which required Debtor's strict compliance with future payment obligations. (Dckt. 40.)

---

[2] *See* Fed. R. Evid. 201.

AO 72A
(Rev. 8/82)

About two and a half months later, on April 1, 2013, Trustee filed a Notice of Non-Compliance of Strict Compliance Order, stating that Debtor had defaulted under the terms of the consent order. (Dckt. 42.) On April 15, 2013, Debtor filed a request for hearing on Trustee's notice of non-compliance. (Dckt. 44.) On May 15, 2013, the Court entered an amended consent order, again requiring strict compliance. (Dckt. 50.)

About two months later, on July 25, 2013, Trustee filed another Notice of Non-Compliance of Strict Compliance Order, stating that Debtor had defaulted under the terms of the amended consent order. (Dckt. 52.) On August 8, 2013, Debtor filed a request for hearing on Trustee's notice of non-compliance. (Dckt. 53.) The Court held a hearing on September 24, 2013, which was continued to November 6, 2013 to allow Debtor to file a modification to his chapter 13 plan. (Dckt. 57.)

On October 2, 2013, Debtor filed a proposed plan modification, to which the Trustee objected on October 22, 2013. (Dckts. 60, 63.) Claxton Bank, likewise, objected to the plan modification the next day. (Dckt. 65.) Later, the bank supplemented its plan objection, adding the contention that the modification was not proposed in good faith and, therefore, cannot be approved. (Dckt. 78.)

A hearing on Trustee's notice of non-compliance was held on November 6, 2013 and was subsequently continued to December 18, 2013 to provide Debtor the

opportunity to address the objections raised in Trustee's Motion on Plan Confirmation (dckt. 69). (Dckt. 72.) On December 18, 2013, the Court held a confirmation hearing on the proposed plan modification as well as a hearing on Trustee's notice of non-compliance.[3] (Dckt. 79.) At the consolidated hearing, Claxton Bank presented the testimony of James Durrence, II, Senior Vice President for Claxton Bank, and Manuel Balcarcel, the owner of a local body shop. The Court finds the testimony of Mr. Durrence and Mr. Balcarcel to be credible in all respects. Debtor also testified at the hearing.

B.   Background

Debtor has engaged in the pine straw business for the last eight years. (Hr'g Tr. Dec. 18, 2013, dckt. 82, at 52:8–9, 60:19–21.) In May 2011, Debtor went to Claxton Bank to get a loan to cover expenses that he expected to incur to complete a new contract with Georgia Southern University. (Dckt. 82, at 18:24 to 19:1.) Debtor executed a sixty-day promissory note on May 4, 2011 in favor of Claxton Bank in the original principal amount of $12,255.39 ("First Note"). (Dckt. 82, at 18:24 to 19:8, 83:7–8.) A security agreement executed that same day shows that the following property served as collateral for the First Note: a 2006 Nissan Frontier, a 1999 Chevrolet Tahoe, a 2000 G3 boat, 2000 Yamaha boat motor, 2000 Bear Trailer boat trailer, and a pine straw baler. (Claims

---

[3] According to Trustee, Debtor was delinquent in his plan payments by $5,940 as of the hearing. (Hr'g Tr. Dec. 18, 2013, dckt. 82, at 4:21–22.)

Register 2-1, at 13–18.)[4]

When the First Note came due, Debtor told Claxton Bank that Georgia Southern University had not paid him yet. (Dckt. 82, at 19:5–8.) On July 22, 2011, Claxton Bank agreed to renew the First Note's balance after Debtor paid $2,800 on the First Note, creating a new note in the original principal amount of around $9,800 ("Second Note"). (Dckt. 82, at 19:5–8, 33:1–5, 76:14–15.) A handwritten notation on the security agreement indicates that the 2006 Nisan Frontier was released by the bank on December 29, 2011. (Trial Ex. A, at 27; Claims Register 2-1, at 14.) Mr. Durrence testified that the Frontier was released after the debtor paid $2,200 on the Second Note. Debtor testified that he paid $580 to Claxton Bank to release the lien on the Frontier. (Dckt. 82, 51:2–15.)

In December 2011, Debtor wanted to purchase a 2011 GMC 3500 Denali Dually ("Denali"). Claxton Bank agreed to combine the Second Note with what would have been a separate note for the money needed to purchase the Denali so that Debtor would have only one payment. (Dckt. 82, at 19:5–8.) On December 28, 2011, Debtor executed a five-year promissory note in favor of Claxton Bank in the original principal amount of $55,018.00 ("Third Note"). (Trial Ex. A.) The Third Note's funds paid in full the Second Note ($9,800), a loan documentation fee ($200), and a recording service

---

[4] At the hearing, the parties stipulated to the Court taking judicial notice of the documents attached to Claxton Bank's Proof of Claim. (Dckt. 82, at 50:10–18.)

charge ($18). All of the remaining proceeds were disbursed to T & S Enterprises, a Texas business, to purchase the Denali. (Disbursement Register, Trial Ex. A.) As security for the Third Note, Claxton Bank took a security interest in the Denali and retained its security interests in the collateral that secured the Second Note, which included a 1999 Chevrolet Tahoe, a 2000 G3 boat, a 2000 Yamaha boat motor, a 2000 Bear Trailer boat trailer, and a pine straw baler. Claxton Bank perfected its security interests by filing UCC financing statements and noting its liens on the titles of the Denali and Tahoe. (Trial Exs. B, C.) In January 2012, Debtor flew to Texas to take delivery of the Denali. (Dckt. 82, at 67:20–23.) In June 2012, Claxton Bank debited $3,800 from Debtor's checking account to pay sales tax for the Denali so that the Georgia Department of Driver Services would issue the title to the vehicle so that the bank could show its lien. (Dckt. 82, at 68:16–20, 79:3–24.) Although the bank made prior attempts to have Debtor pay the tax directly, the bank's debiting of the checking account would later prove to be a motive for some of Debtor's acts. (Dckt. 82, at 79:4–12.)

Debtor told Claxton Bank that the Denali would be used as a family vehicle and to pull a trailer for work. (Dckt. 82, at 21:21–25.) He told the bank that he intended to keep the Frontier to collect pine straw in the woods. (Dckt. 82, at 22:2–6.) Mr. Durrence testified that the loan documents did not contain any restrictions regarding what purposes the Denali could be used for. (Dckt. 82, at 34:5–7.)

Debtor has not made regular payments on the Third Note.[5] (Dckt. 82, at 22:7–10.) Debtor also borrowed money from Claxton Bank on July 17, 2009 to purchase a 2009 Ford Edge and has not made regular payments on that note either. (Claims Register 3-1, at 3; Dckt. 82, at 22:14–21; Trial Exs. E, F.)

Only twenty-six days before filing for bankruptcy, on June 29, 2012, Debtor called Mr. Durrence and said that he had sold the 2000 G3 boat, 2000 Yamaha boat motor, and 2000 Bear Trailer boat trailer for $3,500 and asked Mr. Durrence to release that collateral. (Dckt. 82, at 24:4–7.) Mr. Durrence agreed to release the boat, motor, and trailer if Debtor paid the bank $3,500 plus about $100 in late fees (this would have reduced Debtor's loan principal on the Third Note by $3,500). (Dckt. 82, at 24:7–12.) Debtor agreed and said that he would bring the money to the bank on Monday. But, he neither went to the bank on Monday nor ever paid the $3,500. (Dckt. 82, at 22:13–20.)

At the hearing, Debtor testified that he sold the pine straw baler for $1,000 in April 2011 (only a year and a few months before filing for bankruptcy) without Claxton Bank's permission. (Dckt. 82, at 60:6–18.) Debtor testified that he sold the boat, motor, and trailer for $3,000, which is $500 less than the amount that he had previously told Mr. Durrence. (Dckt. 82, at 61:5–9.) When asked what he did with the money, Debtor responded: "I paid in the $4,000 into that $12,000 note" "over a course of time."

---

[5] Claxton Bank's record of transactions relating to the Third Note (ex. A., dckt. 78) was entered into evidence without objection at the hearing. (Dckt. 82, at 81:5–8.)

AO 72A
(Rev. 8/82)

(Dckt. 82, at 61:12–19.) Counsel for Debtor stipulated that these prepetition sales were not disclosed in his Statement of Financial Affairs. (Dckt. 82, at 65:2–9.)

Similarly, Debtor admitted that he sold the Tahoe in 2012 without Claxton Bank's permission. (Dckt. 82, at 71:7–11.) The bank learned about the sale when a woman came to the bank, stating that she paid Debtor $3,000 and that Debtor told her that he would have the title released. (Dckt. 82, at 25:2–16.) Debtor testified that he expected Claxton Bank to release an equivalent amount to the "$4,000 worth of money" that he had repaid on the First Note. (Dckt. 82, at 56:14–18.) The bank never agreed to this arrangement, however. The Court finds that Debtor was indignant over Claxton Bank's refusal to release any additional collateral after he made payments on his obligation, and he also resented the bank for deducting $3,800 from his checking account for the Denali's sales tax. (Dckt. 82, at 68:11–23.)

At Debtor's § 341 Meeting of Creditors, which was held on August 23, 2012, he was asked: "In the past two years, have you sold, traded, or given away any property?" Debtor responded: "No." (Dckt. 82, at 88:15–17.) This testimony was false.

Photographs of the Denali when it was purchased were entered into evidence. (Trial Ex. G.) Mr. Durrence described the vehicle as the nicest that GMC makes and that it has every option on it. (Dckt. 82, at 27:4–9.) Debtor returned the vehicle to Claxton Bank in November 2013 by leaving the vehicle in the parking lot next to the

SAO 72A
(Rev. 8/82)

bank's parking lot. (Dckt. 82, at 54:9–13.) Photographs of the Denali when the Debtor left it in the parking lot were also entered into evidence. (Trial Exs. H–S.) Mr. Durrence described extensive damage to the Denali. (Dckt. 82, at 29:3 to 30:16.) For example, the front bumper was held on with hay twine, the front passenger side door handle was missing, and there were numerous dents in the metal. The Denali's interior was not significantly damaged (dckt. 82, at 31:21 to 32:4.), and Mr. Durrence testified that he had no evidence that Debtor intentionally damaged the Denali. (Dckt. 82, at 35:37–39.)

The reason why the Denali will not start remains a mystery. Debtor testified that he drove it to the place where he left it and then put those same keys in Claxton Bank's overnight drop box. Mr. Durrence said that he got the radio to turn on but the engine would not turnover. (Dckt. 82, at 30:17–22.) In any event, the Denali was then towed to Manuel's Body Shop. (Dckt. 82, at 31:2–16.)

Debtor testified that the Denali became damaged "working every day in the pine straw business." (Dckt. 82, at 51:25 to 52:4.) At some point, he hit a deer traveling at fifty-five miles per hour, causing "pretty good" damage to the vehicle's front end and undercarriage according to Debtor. (Dckt. 82, at 52:11–19.) He also accidently damaged the rear end of the vehicle while driving in reverse when he "jackknifed" the trailer because he was not paying attention and crashed into the side of his own trailer. (Dckt. 82, at 53:1–6.) On another occasion when Debtor was returning from north Georgia, a tire exploded, causing a fender and one of the rear running lights to break off

and other damage. (Dckt. 82, at 53:18–22.) Despite all of these damage-causing incidents, he chose *not* to have the vehicle repaired because he did not want his insurance premiums to increase. (Dckt. 82, at 52:20–25.)

Manuel Balcarcel, a body shop owner who is experienced in estimating the amount of damage to vehicles, also testified at the hearing. Mr. Balcarcel inspected the damage to the Denali and created an estimate of the costs to repair the vehicle, which totaled $10,355.89. (Dckt. 82, at 40:17 to 42:24.) Mr. Balcarcel testified that the damage appeared to be the result of accidents. (Dckt. 82, at 45:11–18.)

Debtor's plan modification proposes to pay Claxton Bank $14,400 for the following property, which he has already sold out of trust: a 1999 Chevrolet Tahoe, 2000 Yamaha boat motor, 2000 Bear Trailer boat trailer, and a pine straw baler. (Dckt. 60, ¶ 3; dckt. 82, at 56:5–11.) The modification also proposes to surrender the Denali in full satisfaction of its secured claim, allowing Claxton Bank 120 days to file a deficiency claim that would be treated as a general, unsecured claim. (Dckt. 60, ¶ 5.) Debtor's original plan (and plan modification) proposes a zero percent dividend to unsecured creditors.

## CONCLUSIONS OF LAW

This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court has jurisdiction pursuant to 28 U.S.C. § 1334.

Under chapter 13 of the Bankruptcy Code, "any individual with regular income may file for . . . reorganization and make payments to a trustee under bankruptcy court protection, with the trustee fairly distributing the funds deposited to creditors until all debts have been paid." *Brown v. Gore (In re Brown)*, No. 13-10260, 2014 WL 563601, *6 (11th Cir. Feb. 14, 2014) (quoting *United States v. Devall*, 704 F.2d 1513, 1515–16 (11th Cir. 1983)) (internal quotation marks omitted). These payments to creditors are made in accordance with a plan that is proposed by the debtor and confirmed by the bankruptcy court. *See* 11 U.S.C. §§ 1321, 1325.

Section 1329 governs modification of a confirmed chapter 13 plan. That section provides in part that § 1325(a) of the Bankruptcy Code applies to plan modifications. 11 U.S.C. § 1329(b)(1); *In re Saunders*, No. 05-14158bf, 2008 WL 724770, at *4 (Bankr. E.D. Pa. Mar. 17, 2008). Section 1325(a) requires, *inter alia*, that a plan be proposed in good faith. 11 U.S.C. § 1325(a)(3).

In the Eleventh Circuit, bankruptcy courts determine whether a plan has been proposed in good faith by evaluating the plan using a non-exhaustive list of factors adopted by the United States Court of Appeals for the Eleventh Circuit in *Kitchens v. Georgia Railroad Bank & Trust Co. (In re Kitchens)* and its progeny. Those factors are:

(1) "the amount of the debtor's income from all sources";
(2) "the living expenses of the debtor and his dependents";
(3) "the amount of attorney's fees";
(4) "the probable or expected duration of the debtor's Chapter 13 plan";

(5) "the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13";
(6) "the debtor's degree of effort";
(7) "the debtor's ability to earn and the likelihood of fluctuation in his earnings";
(8) "special circumstances such as inordinate medical expense";
(9) "the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors";
(10) "the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors";
(11) "the burden which the plan's administration would place on the trustee";
(12) "the extent to which claims are modified and the extent of preferential treatment among classes of creditors";
(13) "substantiality of the repayment to the unsecured creditors"; and
(14) "other factors or exceptional circumstances."

*Brown*, 2014 WL 563601, at *7 (quoting *Kitchens v. Ga. R.R. Bank & Trust Co. (In re Kitchens)*, 702 F.2d 885, 888–89 (11th Cir. 1983)). These factors attempt to shed light on a more basic inquiry: Whether or not there has been an abuse of the provisions, purpose, or spirit of the Bankruptcy Code. *See Meredith v. Roberts (In re Roberts)*, No. 11-60690, 2013 WL 441378, at *2 (Bankr. S.D. Ga. Jan. 24, 2013) (Dalis, J.) (quoting *Kitchens*, 702 F.2d at 888).

      Claxton Bank argues that four of the *Kitchens* factors are relevant here: (1) Debtor's sincerity in seeking chapter 13 relief; (2) his degree of effort; (3) the circumstances of his dealings with creditors; and (4) Debtor's dishonesty in his dealings with the Court and Claxton Bank. (Dckt. 78, ¶ 2.)

After reviewing the factors and other considerations identified in *Kitchens* and its progeny, the Court largely agrees with Claxton Bank and concludes that the totality of the circumstances reflects that Debtor's plan modification was *not* proposed in good faith. I consider the Debtor's failure to deal fairly with Claxton Bank and his dishonesty with the Court as the most important determinations supporting my conclusion in this case.

Debtor has dealt unfairly with Claxton Bank. Although Debtor did not intentionally damage the Denali, he intentionally failed to file insurance claims and repair the vehicle after hitting a deer, a tire blew out, he backed into his own trailer, and rough work in the woods caused damage to the vehicle's exterior. Common sense dictates that a luxury vehicle such as the Denali should not be operated in the woods. Even if Debtor chose to use the vehicle as a work truck, which the bank conceded was not prohibited, his abuse of the truck without repairing it demonstrates that he operated under his own set of rules. Now, he wants to surrender the vehicle after he caused the rapid decline of its value. Because the Denali secured the Third Note, basic notions of equity and fairness would be violated if Debtor was allowed to modify his plan in the manner that he proposes. Essentially, the Court would be enabling Debtor to abuse the protections afforded to him by the Bankruptcy Code because he used that protection to retain collateral and then improperly used the collateral in a way that prejudiced Claxton Bank's rights in the Denali.

Another glaring example of Debtor's blatant disregard of the contractual rights of Claxton Bank is his deliberate sales of collateral out of trust. He sold the following collateral out of trust: a 1999 Chevrolet Tahoe, a 2000 G3 boat, a 2000 Yamaha boat motor, a 2000 Bear Trailer boat trailer, and a pine straw baler. It is clear to the Court that Debtor was irritated by the bank's unwillingness to release collateral from the security agreement. In response, he simply exercised control over the bank's collateral under his own terms.

Worse still, Debtor has repeatedly lied to the Court and others involved in the administration of this bankruptcy case. Debtor lied in his Statement of Financial Affairs, which he verified, by stating that he had made no transfers of property in the previous two years. (Dckt. 1, at 27.) In that statement, Debtor should have disclosed all of the transfers he made out of trust. But, he failed to do so. Next, Debtor lied again at his § 341 Meeting of Creditors when he stated that he had not sold, traded, or given away any property in the past two years. To the extent that any of these transfers occurred after Debtor made these false statements, he had a continuing duty to supplement his answers, which he failed to do. His sales out of trust and his failure to deliver the proceeds of those sales to Claxton Bank also reflect a failure to deal honestly with the bank.

As stated by the Eleventh Circuit Court of Appeals in *Waldron*: "The cornerstone of the bankruptcy courts has always been the doing of equity. The protections and forgiveness inherent in the bankruptcy laws surely require conduct consistent with

the concepts of basic honesty." *Shell Oil Co. v. Waldron (In re Waldron)*, 785 F.2d 936, 941 (11th Cir. 1986). If Debtor had merely fallen behind in his payments and been unable to fulfill his contractual obligations, then bankruptcy relief would be available to him to modify those obligations. However, I find that Debtor has ignored his obligations and the rights of his creditors, and as a result, his proposed plan modification was not filed in good faith. *See Roberts*, 2013 WL 441378, at *2. Therefore, Debtor's proposed modification to his confirmed chapter 13 plan (dckt. 60) must be DISAPPROVED.

As the United States Bankruptcy Court for the Southern District of Georgia has already explained: "Failure to make accurate disclosure in bankruptcy documents, making fraudulent representations to the court, or an unfair manipulation of the Bankruptcy Code is sufficient cause for dismissal." *Roberts*, 2013 WL 441378, at *3 (quoting *Orcutt v. Crawford*, No. 8:10-CV-1925-T-17, 2011 WL 4382479 (M.D. Fla. Sept. 20, 2011)) (internal quotation marks omitted). However, the Court does not need to dismiss the case for this reason because there is another, more obvious ground. Trustee argues that the case should be dismissed for Debtor's failure to make the payments that he promised under an order that required strict compliance. It is undisputed that he is delinquent in his payments, and therefore, I grant Trustee's motion to dismiss.

The Court also concludes that dismissal with prejudice to refiling for 180 days is appropriate because Debtor's conduct in this case was dishonest and rises to the level of bad faith. *See The Coastal Bank of Ga. v. Archibald (In re Archibald)*, 314 B.R.

876, 879–80 (Bankr. S.D. Ga. 2004) (Davis, J.) (dismissing case with prejudice by barring refiling for 180 days where the debtor was dishonest with the bankruptcy court); *In re Howard*, No. 92-11601, 1994 WL 16005432, at \*3 (Bankr. S.D. Ga. June 24, 1994) (Dalis, J.).

## O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that Debtor's proposed plan modification (dckt. 60) is DISAPPROVED. Trustee's motion to dismiss (dckt. 52) is GRANTED.

FURTHER ORDERED that Debtor is barred from refiling any case under Title 11 for a period of 180 days after the entry of and finality of this Order.

Dated at Savannah, Georgia, this 26th day of March, 2014.

Edward J. Coleman, III
United States Bankruptcy Judge